## In re Anonymous No. 62 D.B. 75

Disciplinary Board Docket no. 62 D.B. 75.

McDONNELL, *Board Member,* January 4, 1980—Pursuant to Pa.R.D.E. 208(d)(iii) the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above petition for discipline.

## I. HISTORY OF PROCEEDINGS

On November 25, 1975, the Supreme Court of Pennsylvania placed respondent, [ ], on the inactive list as a result of respondent having been charged with various violations of the Pennsylvania Crimes Code. Thereafter, respondent was committed to the [ ] State Hospital. On March 29, 1978, the Supreme Court referred this matter to the Disciplinary Board. A petition for discipline was filed by the office of disciplinary counsel, and a hearing held on February 5, 1979. The hearing committee consisted of [ ] and [ ]. The third member, [ ], withdrew from the committee, and both petitioner and respondent agreed to his withdrawal.

Hearings were held and sworn testimony taken on three separate occasions: February 7, April 10 and April 18, 1979. In addition to the testimony taken at these hearings and the documents incorporated into the record under Rule 89.141(b) of the rules of the Disciplinary Board, the record herein consists of petitioner's exhibits P-1 through P-7, respondent's exhibits R-1 through R-51, and joint exhibit J-1, a stipulation of fact admissible and binding on both parties pursuant to Rule 89.131 of the rules of the Disciplinary Board.

The office of disciplinary counsel was represented by [ ], and respondent was represented by

[ ], Esq., of the [ ] Bar. After the testimony was closed, the hearing committee recommended that respondent be suspended for a period of five years, retroactive to November 25, 1975, and then being able to apply for reinstatement after July 25, 1980. No exceptions to the report of the hearing committee have been filed by either petitioner or respondent.

## II. FINDINGS OF FACT

1. As of June, 1975, respondent was a 31-year-old attorney admitted to the bar of the Commonwealth of Pennsylvania and practicing as an associate with the law firm of [ ], in its office located in [ ], Pa.

2. At or about the same time respondent was lawfully married to, but separated from, [Mrs. Respondent] (hereinafter Mrs. [R]); respondent and Mrs. [R] separated on or about June 23, 1975.

3. In early July of 1975, respondent was informed by his employer that his services would be terminated at the end of the year. At about the same time, respondent also learned that his wife, who was no longer living with respondent, was seeing another man.

4. On August 15, 1975, at 11:06 p.m., Mrs. [R] and a Mr. [A] boarded a one-car [ ] train in [ ] which was bound for [ ] Station, [ ]. Among the other persons on the train were the engineer, Mr. [B], and a passenger, Mr. [C].

5. At or about 11:25 p.m., on the date aforesaid, at [ ] Station, respondent boarded the same train on which Mrs. [R] and Mr. [A] were riding. Respondent took a seat in the rear of the car; concealed in his coat, respondent carried a loaded .38 caliber, 6

shot revolver which he had purchased on or about July 9, 1975.

6. Respondent bought the aforementioned pistol because his home had been broken into during the time he and Mrs. [R] had still been residing together; since that break-in and until July 9, 1975, respondent had sought to purchase a good quality pistol.

7. At or about 11:30 p.m. on the aforesaid date, when the train reached a point at or near [　], respondent drew his revolver, approached Mrs. [R] from the rear, and fired five shots at her. Two of the shots struck Mrs. [R] in the back of the head, one struck her in the cheek, and two struck her in the back, between the shoulders and waist, causing serious wounds to her person and necessitating her hospitalization for six days.

8. Thereafter, respondent ordered Messrs. [A], [C] and [B], to jump from the train which still was moving.

9. All of the aforementioned parties did jump from the train pursuant to respondent's order. As a result of his jump, Mr. [C] sustained a broken leg for which he received hospital treatment. Mr. [C] was discharged from the hospital one day after the incident occurred.

10. Respondent himself then jumped from the train, which had since stopped, and threw his pistol into the garden at the [　]. Shortly thereafter, at or about midnight, respondent telephoned a friend, [D], M.D., telling Dr. [D] to care for respondent's two children who were staying with respondent at the time.

11. Respondent then secluded himself until on or about October 24, 1975, when he voluntarily committed himself into the State Hospital (hereinafter [SH]).

12. On or about October 24, 1975, the Honorable [E], Judge of the Court of Common Pleas of [   ] County, changed respondent's commitment from a voluntary to an involuntary commitment. On October 27, 1975, Judge [E] extended this order for one week so that the court could hold a hearing to determine whether respondent was competent to stand trial.

13. At the time of his commitment to [SH], respondent was diagnosed by qualified psychologists as suffering from manic depression, hysterical personality with anti-social features, and alcoholism.

14. After respondent's commitment, both respondent's personal psychologist and the staff at [SH], based on the diagnosis as set forth above, recommended that the court find respondent incompetent to stand trial because of his fragile mental condition.

15. Based upon testimony and evidence received at hearings held on October 27 and November 6, 1975, the court found respondent incompetent to stand trial and entered an order dated November 7, 1975, committing respondent to the Director of [SH] for 60 days, at the end of which time the issue of respondent's ability to stand trial was to be reconsidered.

16. Pursuant to the order finding respondent incompetent to stand trial, the Supreme Court of Pennsylvania entered an order dated November 25, 1975, placing respondent on the inactive role of attorneys admitted to practice in the Commonwealth of Pennsylvania, in accordance with Rule 17-20(a) (now Rule 301(a)) of the Rules of Disciplinary Enforcement.

17. As a result of an [SH] staff conference held on or about March 11, 1976, by letter dated March 19, 1976, the Director of [SH] advised the court that the

staff believed that respondent was competent to stand trial but required further treatment, and therefore should remain at [SH].

18. In or about June of 1976, informations were filed in the Court of Common Pleas of [   ] County in the matter of Com. v. [Respondent], June Term 1976, nos. [   ], charging respondent with various violations of the Crimes Code.

19. On or about July 22, 1976, respondent entered a plea of nolo contendere to two of the eight informations as part of a negotiated plea whereby the District Attorney's office nol prossed the remaining six bills of indictment. Each bill to which respondent entered his plea charged him with simple and aggravated assault.

20. However, because of his mental condition, respondent remained committed at [SH] until his release on January 25, 1978, over two years after his commitment.

21. As a result of the negotiated plea, respondent was sentenced on January 25, 1978, the day of his release from [SH], to a term of imprisonment of not less than one year nor more than two years, three months duration, with credit for the two years, three months he spent as an in-patient at [SH]. In addition, respondent was sentenced to a five year term of probation, with specified conditions, beginning January 25, 1978.

22. Both during his commitment at and after his release from [SH], respondent showed significant progress in improving his mental health as a result of his willingness to receive treatment and psychiatric assistance and his taking on a regular basis prescribed doses of lithium carbonate. The key to respondent's progress was the lithium car-

bonate chemotherapy, which began in or about January of 1976. Treatment of persons, such as respondent, diagnosed as manic depressives with lithium is analogous to the treatment of diabetics with insulin. To be successful, lithium treatment must continue throughout the lifetime of respondent. Thus far, respondent has steadfastly taken his prescribed doses of lithium, and there is no indication that he will not continue to do so in the future. Lithium does not interfere with a person's maintaining a normal life in a professional position.

23. Since his release from [SH], respondent has shown his ability to handle stressful situations and, from all the evidence, appears to have shown himself capable of conducting himself in a manner that is beneficial both to himself and to the community. For example, the evidence shows that respondent has complied with all conditions established by the Courts of the Commonwealth of [ ] in connection with respondent's visitation rights with respect to his two children to the point where those rights have been expanded and made more flexible, as well as complying with all conditions of his parole. Furthermore, respondent has organized and participated in a number of Alcoholics Anonymous and similar groups and all the evidence indicates that respondent himself has not imbibed any alcoholic beverage since December 5, 1975. Respondent also has maintained an active role as a community member of the Human Rights Committee at [SH]; has been active in the Sunday School program at his neighborhood church, [ ] Church; reorganized a local brass music group; and participated actively in other community activities. Because of the sig-

nificant improvement in his mental health, his community involvement and other assets, respondent has won the respect and confidence of the same community in which he lived prior to the shooting incident, as well as of others outside that community, including attorneys and members of the clergy.

24. Since approximately the spring of 1978, respondent has acted as a legal intern at [   ] Division of Mental Health Advocacy, a division of that state's Department of the Public Advocate; respondent started as a volunteer with the Division, was later hired on a part-time basis, and is currently a full-time employe. Both the Director of the Division and other attorneys working at that office have praised the legal skills evidenced by respondent in his work at the Division. Finally, except for the possible exceptions of matters involving domestic disputes, respondent now is psychologically fit to practice law.

25. Respondent is 34 years old; resides at [   ] Street, [   ], [   ], Pennsylvania; has two children, ages seven and five, who reside with respondent's ex-wife in [   ], Virginia; graduated with a Bachelor of Arts degree from University of [   ] in 1966 and with a joint J.D.-M.B.A. degree from [   ] University; was admitted to the Bar on January 17, 1972; and worked as an Associate in the [   ] office of [   ] until August 15, 1975. Respondent has not been involved in any disciplinary proceedings prior to the instant proceeding.

## III. DISCUSSION

Under the applicable Pa.R.D.E. 214(c), the board's only concern in this matter is to recommend

the final discipline to be imposed. The committee, in making its recommendation, was guided by the principle that the sole function of the disciplinary proceeding is to determine whether an attorney's character, as shown by his or her conduct, makes the attorney unfit to practice law; any discipline is not intended to be punitive in nature but is merely imposed when necessary to protect the public and the judicial system. See In the Matter of Marx S. Leopold, 469 Pa. 384, 366 A. 2d 227 (1976).

In this case, the hearing committee heard testimony from numerous doctors who have treated respondent, including both psychiatrists and psychologists, as well as hearing testimony from lawyers, persons affiliated with chuch groups, and persons who have worked with respondent in his community in Alcoholics Anonymous, and from the [ ] Mental Health Department where respondent is presently working. The doctors were unanimous in their conclusion that respondent is rehabilitated and is able to function as a lawyer. The testimony of the other witnesses was most supportive of respondent. The committee also received numerous letters from persons from all walks of life who also were of the opinion that respondent is an active, effective member of the community.

Finally, the committee was most impressed with the testimony and demeanor of respondent himself, who appreciates the seriousness of his offenses and is most contrite for his actions. He also recognized that he must continue counselling and the taking of the prescribed lithium medication.

From the entire record, it would appear that respondent's actions resulted from a person suffering from manic depression and alcoholism, at a time in his life when he was under tremendous personal

and professional pressure, in that his wife had just left him and his association with the law firm was being terminated.

The committee concluded, after reviewing all of the testimony and exhibits, that respondent has recovered from his illnesses and has displayed an ability to function adequately as a lawyer. Since his release from the hospital, respondent has worked as a legal intern with the [    ] Mental Health Agency and has been active in community and church affairs, and maintains his association with Alcoholics Anonymous.

Both the disciplinary counsel and respondent's counsel recommended a five-year suspension retroactive to the time when respondent committed the criminal offenses. The hearing committee agreed essentially with this recommendation, but revised the five-year suspension to run from the date that this court placed respondent on the inactive list. The committee's recommendation was that respondent be suspended for five years, retroactive to November 25, 1975, and be allowed to apply for reinstatement after July 25, 1980. The board, after reviewing the entire record, concurs in this recommendation.

## IV. RECOMMENDATION

For the reasons set forth above, the Disciplinary Board recommends to your honorable court that respondent, [   ], be suspended for a period of five years retroactive to November 25, 1975, and be allowed to apply for reinstatement after July 25, 1980.

May Bell Hammerman, John C. Anderson and Dennis C. Harrington did not participate in the adjudication.

## ORDER

EAGEN, *C.J.*, And now, January 22, 1980, the recommendation of the Disciplinary Board of the Supreme Court of Pennsylvania dated Januay 4, 1980 is modified and as modified is accepted; and it is ordered and decreed, that [Respondent], be, and he is forthwith suspended for five years from November 25, 1975, and may not apply for reinstatement until after November 25, 1980.

Mr. Justice Larsen dissents and is of the opinion that respondent's violent behavior warrants disbarment.